IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 23, 2024

## STATE OF TENNESSEE v. JEFFREY MILTON STOKES AKA REAL BLACK

**Appeal from the Criminal Court for Knox County**
**No. 110010   G. Scott Green, Judge**

_____

### No. E2023-00667-CCA-R3-CD

_____

The defendant, Jeffrey[1] Milton Stokes aka Real Black, was convicted by a Knox County jury of first-degree premeditated murder and reckless endangerment, and he was sentenced to an effective term of life imprisonment.  On appeal, the defendant argues that the evidence is insufficient to sustain his convictions.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Christopher M. Rodgers, Knoxville, Tennessee, for the appellant, Jeffery Milton Stokes aka Real Black.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Charme P. Allen, District Attorney General; and G. Lawrence Dillon and Ashley D. McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

*Facts and Procedural History*

---

[1] The defendant's first name is spelled variously as "Jeffery" and "Jeffrey" throughout the record.  We utilize the spelling as in the presentment, "Jeffrey."

The victim, Alan Johnson, was shot to death on the evening of December 12, 2015, as he walked home from the McDonald's restaurant where he worked. The State's theory at trial was that the defendant was not the gunman but was criminally responsible for the actions of the suspected shooters. Moreover, the proof indicated that the shooting of the victim was the result of mistaken identity – the victim looked remarkably similar to another individual with whom the defendant and the suspected shooters had a rivalry.

At trial, Diane Ortez testified that she worked with the victim on the night of December 12, 2015. When the victim's shift ended at 10:00 p.m., he said goodbye to Ms. Ortez and told her he was "going to walk to [a] family member's house." The victim's cousin, Stanley Johnson, recalled that he and the victim had plans to go out that night. The victim called to inform Mr. Johnson that he had gone home to change clothes after work and was walking to Mr. Johnson's home. When the victim never made it to his house, Mr. Johnson assumed the victim had made other plans. The next morning on his way to work, Mr. Johnson noticed "a lot of police up the street from [his] house" and, when he got to work, he received a call informing him that the victim had been shot and killed.

On the night of December 12, Knox County 911 received several calls reporting shots fired in the area of East 5th Avenue and Elmwood Street in Knoxville. One caller, Esther Heneise, who lived on the corner of East 5th and Elmwood, "was woken up by the sound of a lot of gunshots." After hearing the gunshots, Ms. Heneise looked out the window and saw two men run down Elmwood, onto East 5th, and then "cut into somebody's yard" and out of view. Another caller, Terry Maples, was at his home on Woodbine Avenue, which runs parallel to East 5th, watching television when he "heard multiple gunshots go off." Mr. Maples looked out the door and saw the victim jump off a retaining wall between two houses across the street. The victim "fell and collapsed into the road," and then "got back up and ran struggling down the sidewalk" out of sight. The victim was "limping really bad." William Smith, who lived on East 5th Avenue and had a home surveillance system, provided the camera footage to the police. The footage showed two individuals running down the street around the time the shots were fired. Mr. Smith also heard the gunshots that night. In another 911 call, the recording of which was played for the jury and entered as an exhibit at trial, the caller, George Hopkins, reported to living at 2919 East 5th Avenue and to having just had gunshots enter into the bedroom of his home.

Investigator John Stevens with the Knoxville Police Department ("KPD") was on patrol in the East Knoxville area the night of December 12, when he heard a "shots fired" call over the police radio and a description of a Buick as a possible vehicle involved. As he was driving to the scene, Investigator Stevens noticed a Buick traveling in the area, so he got behind the vehicle and ran the tag. The vehicle was registered to the defendant. Investigator Stevens followed the vehicle until it turned into an "after-hours wings bar."

He circled the block and then pulled into a parking lot across the street to observe the vehicle. Investigator Stevens saw two African-American males approach the vehicle and get in on the passenger side. At that point, Investigator Stevens did not believe he had a legitimate reason to detain the vehicle, so he continued to patrol the area.

The morning after the shooting, Laurette Crippen, who lived on Woodbine Avenue, noticed something in her neighbor's yard. Upon closer inspection, Ms. Crippen realized it was a human body and had her daughter call 911. Ms. Crippen also noticed what appeared to be blood around the body. Sergeant Brian Dalton, supervisor of the KPD forensic unit, responded to the scene while the victim's body was still on site. Sergeant Dalton reviewed the numerous photographs he took at the scene, specifically noting a blood trail leading up to the victim's body. Sergeant Dalton also noted that a spent bullet fragment was found on the floor in the bedroom of the home at 2919 East 5th Avenue and another fragment was found near the downspout of the home at 3002 Woodbine Avenue.

Brittany Whitehead, a friend of the defendant and stepmother of Kedaris Gilmore, who was known as "K.D.," received a call from Mr. Gilmore's mother the morning after the shooting. Mr. Gilmore's mother was concerned of his whereabouts because she had not heard from him and "something had happened on the street" where he was supposed to be. Ms. Whitehead called the defendant because she knew that he and Mr. Gilmore frequently hung out together. She asked the defendant if he knew where Mr. Gilmore was, and the defendant replied, "Why? What's up?" Ms. Whitehead told the defendant that an incident had happened close to where Mr. Gilmore was supposed to be and that they had not been able to get ahold of him. The defendant responded, "Okay. I'll call you back." Ms. Whitehead did not hear back from the defendant, but she learned from Mr. Gilmore's mother that Mr. Gilmore had returned home and said that he had been with the defendant.

About a week later, the defendant called Ms. Whitehead and told her that he had knowledge that Mr. Gilmore and another individual she did not know were responsible for the shooting of the victim. Ms. Whitehead heard that the other individual was Alim Turner. The defendant told Ms. Whitehead that "[h]e got [the] gun back from Mr. Gilmore and whoever the other person was" and that he dropped Mr. Gilmore off at his grandmother's house the night of the murder. The defendant also told her that the police had followed his car that night, and he was afraid the other individual "might talk." The defendant expressed to Ms. Whitehead that he was nervous about the police taking his car and that "he wished the police didn't find the gun." Ms. Whitehead recalled that Investigator Terry Pate showed her a home security video from the night of the incident and that she told him she was "80% sure" one of the individuals shown running on the video was Mr. Gilmore Ms. Whitehead heard "from talk in general around the city" that the victim was killed because he was mistaken for someone else.

Investigator Jordan Henderson, a gang expert with the KPD organized crime gang intelligence unit, explained that rivalry was essential in the "gang world" and that there was an on-going rivalry between the Vice Lords and Rollin' 60 Crips gangs in Knoxville at the time of the shooting. Investigator Henderson identified the defendant, Kedaris Gilmore, and Alim Turner as members of the Vice Lords.

Investigator Henderson identified an individual named Jerell Davis, aka "J. Rollin," as being an active member of the Rollin' 60 Crips and said there was "longstanding animosity" between the defendant's gang and Mr. Davis's gang. According to Investigator Henderson, Mr. Davis was "highly antagonistic" and had "been the center of the gang beefs . . . for a period of time." However, Investigator Henderson thought it would be unlikely for Mr. Davis to walk alone at night deep inside a rival gang's territory, such as the area where the shooting occurred, but he also acknowledged having seen social media posts where gang members bragged about going through a rival gang's territory. Investigator Henderson identified a photograph of Mr. Davis and compared it to a photograph of the victim, noting their similarity in height, weight, and build.

Investigator Terry Pate with the KPD applied for a search warrant for the defendant's gold 2001 Buick after officers found the car in a parking lot and a canine sniff alerted to the presence of illegal substances. During the search of the vehicle, officers located an assortment of personal items, including the defendant's work badge and a wallet containing the defendant's driver's license. In the trunk, officers found two-way radios, an accordion file containing rap lyrics, and a zippered bag containing a .40 caliber magazine for a firearm. Officers also found a Glock 33 firearm, with a double-stack magazine loaded with .357 ammunition, hidden in the engine compartment. There were no drugs found inside the car aside from some "marijuana shake" in the glove compartment.

Harold Boyce was incarcerated with the defendant and, during their time together, had conversations about the defendant's pending cases. The defendant told Mr. Boyce that he was a member of the Vice Lords gang and that he and some other gang members had "waited for somebody to get off work, and they had killed him." The defendant said that the gun used in the crime had been hidden in the hood of his car and that he "would have beat this case" if he had gotten rid of the gun.

Stephanie Housewright Hopkins, a crime scene technician with the KPD, photographed the crime scene and collected evidence. Among the evidence she collected was twenty cartridge casings and a cell phone. Ms. Hopkins also collected a bullet fragment from inside a nearby house on the floor close to a bed. Ms. Hopkins photographed a bullet defect in a window of the home, as well as bullet defects to a curtain and furniture inside the home.

Patricia M. Resig, a firearms examiner with the KPD, examined the twenty .357 SIG cartridge casings collected from the scene and determined that they were all "fired [from] the .357 SIG caliber Glock Model 33 pistol" found in the defendant's vehicle. Ms. Resig also examined two bullets, one collected from behind a home in the area and one collected from inside another home in the area. Although both bullets displayed consistent classes and some individual characteristics as test fires from the Glock, Ms. Resig was unable to conclusively determine whether the bullets had been fired from the Glock pistol. Ms. Resig stated that the magazine in the Glock pistol held fifteen rounds plus one in the chamber, so the firing capacity was sixteen shots before needing to reload the weapon. Therefore, if twenty rounds were fired from the same weapon, the shooter would have had to reload the magazine or insert another magazine. Alternatively, the Glock 33 can operate with an extended magazine that holds more than sixteen rounds.

Dr. Amy Hawes conducted an autopsy of the victim and determined the cause of death was multiple gunshot wounds.

Following the conclusion of the proof, the jury convicted the defendant as charged of first-degree premeditated murder and reckless endangerment, and the trial court imposed an effective sentence of life imprisonment. This appeal followed.

*Analysis*

The defendant argues that the evidence is insufficient to sustain his convictions. The defendant does not contest the elements of either of the offenses of which he was convicted, but instead, asserts that the proof presented by the State failed to show that he was criminally responsible for the crimes. The State responds that there was overwhelming circumstantial evidence connecting the defendant to the offenses. We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of

the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

First-degree murder is the premeditated and intentional killing of another. Tenn. Code Ann. § 39-13-202(a)(1). Premeditation is "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). Some facts which may be indicative of the existence of premeditation include the use of a deadly weapon on an unarmed victim, the shooting of the victim after he had turned to retreat or escape, the lack of provocation on the part of the victim, the defendant's declarations of his intent to kill, and the defendant's failure to render aid to the victim. *See, e.g.*, *Bland*, 958 S.W.2d at 660; *State v. Martin*, 702 S.W.2d 560, 562-63 (Tenn. 1985), *overruled on other grounds by State v. Brown*, 836 S.W.2d 530, 543 (Tenn. 1992); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

A person "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" commits reckless endangerment. Tenn. Code Ann. § 39-13-103(a). If the reckless conduct is committed by discharging a firearm into an occupied habitation, the reckless endangerment is a Class E felony. *Id.* § -103(b)(3).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999).

"Under a theory of criminal responsibility, an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred." *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002) (citing *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). "No particular act need be shown. It is not necessary for one to take physical part in the crime[;] [m]ere encouragement of the principal is sufficient." *Ball*, 973 S.W.2d at 293. To be criminally responsible for the acts of another, the defendant must "in some way associate himself with the venture, act with the knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree." *Caldwell*, 80 S.W.3d at 38 (citing *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994)).

Moreover, under the doctrine of criminal responsibility, a person is liable not only for the target offense, but also for offenses committed by a confederate that were the natural and probable consequences of the target offense. *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000) (citing *State v. Carson*, 950 S.W.2d 951, 954-55 (Tenn. 1997)). Whether an offense was a natural and probable consequence of the target offense is a question for the jury as the finder of fact. *Id.* The principle behind the rule is "based on the recognition that aiders and abettors should be responsible for the criminal harms they have naturally, probably[,] and foreseeably put into motion." *Id.* To demonstrate liability, the State must prove the following beyond a reasonable doubt: "(1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime." *Id.*

Viewed in the light most favorable to the State, the evidence is sufficient for a rational trier of fact to find the defendant criminally responsible for first-degree murder and reckless endangerment. Shortly after the shots fired call went out on the police radio with the description of a Buick as a possible vehicle involved, Investigator Stevens saw the defendant's Buick in the area and followed it. While surveilling the car, Investigator Stevens saw two African-American males get into the vehicle on the passenger side. Notably, a witness reported having seen two slim African-American men running from the scene after the shooting, and surveillance footage from a nearby house captured two men of the same description running from the scene after the shots were fired. Officers later executed a search warrant of the defendant's vehicle, and what was determined to be the murder weapon was found hidden in the engine compartment.

Brittany Whitehead, a friend of the defendant's and stepmother of Mr. Gilmore, was shown the surveillance footage of the individuals running from the scene and was 80% sure that one of the individuals was Mr. Gilmore. The jury heard testimony at trial that Mr. Gilmore was missing on the night of the shooting and, when he returned home, said that he had been with the defendant. Meanwhile, Ms. Whitehead asked the defendant about Mr. Gilmore's whereabouts, and the defendant did not admit to them being together. However, the defendant later told Ms. Whitehead that Mr. Gilmore and another individual were responsible for the shooting of the victim, and that the defendant "got a gun back" from them and dropped Mr. Gilmore off at his grandmother's house the night of the murder. The defendant expressed to Ms. Whitehead that he was nervous about the police taking his car and that "he wished the police didn't find the gun." The defendant also told Ms. Whitehead that the police had followed his car the night of the incident.

As a possible motive for the shooting, the State presented evidence that Mr. Gilmore and the defendant were members of the Vice Lords gang, and the Vice Lords had an on-going "beef" with the Rollin' 60 Crips. The victim looked remarkably similar to a particularly contentious member of the Crips, Jerell Davis, suggesting that the victim's murder was a case of mistaken identity.

The jury also heard that the defendant admitted his involvement to Harold Boyce while the two men were incarcerated together. According to Mr. Boyce, the defendant told him that he was a member of the Vice Lords gang and that he and some other gang members had "waited for somebody to get off work, and they had killed him." The defendant said that the gun used in the crime had been hidden in the hood of his car and that he "would have beat this case" if he had gotten rid of the gun.

From the sum of this evidence, viewed in the light most favorable to the State, a rational trier of fact could have found that the defendant acted with the intent to promote or assist the commission of the murder and aided in its commission.

The defendant seemingly contests the weight the jury gave to the testimony of Ms. Whitehead and Mr. Boyce. However, as previously noted, evaluating the credibility of the witnesses and determining what weight to give the evidence is within the province of the jury. It is not for this Court to reweigh evidence on appeal.

In addition, as detailed above, the defendant's intent to assist in the murder of the victim makes him criminally responsible for other crimes that are the natural and probable consequence of the murder. The jury received proof that a bullet shattered the window of the home of George Hopkins, damaged a bookcase and broke a mirror inside, and ultimately landed next to his bed. Mr. Hopkins was at home at the time of the shooting. Another bullet struck the exterior of another home. As such, there was sufficient evidence from which the jury could determine that the defendant was criminally responsible for the bullets that struck or entered the homes on the street where the victim was shot and killed, as the danger of stray bullets striking an occupied residence was a natural and probable consequence of firing twenty rounds at the victim in the middle of a residential neighborhood. "[T]he jury, not the court, is vested with the power to weigh the sufficiency of evidence and determine whether collateral crimes, committed by relevant parties in both physical and spatial proximity of the target crime, are the natural and probable consequences of the intended criminal behavior." *State v. Richmond*, 90 S.W.3d 648, 656-57 (Tenn. 2002).

The evidence is sufficient to sustain the defendant's convictions, and the defendant is not entitled to relief.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE